720 So.2d 880 (1998)
Alan B. AXELROTH
v.
HEALTH PARTNERS OF ALABAMA, INC.
1961349.
Supreme Court of Alabama.
July 24, 1998.
*881 Andrew P. Campbell and Charles M. Elmer of Campbell & Waller, L.L.C., Birmingham, for appellant.
Randal H. Sellers and Joe L. Leak of Starnes & Atchison, Birmingham, for appellee.
HOUSTON, Justice.
The plaintiff, Alan B. Axelroth, D.P.M., a licensed podiatrist practicing in Jasper, appeals from a summary judgment for the defendant, Health Partners of Alabama, Inc. ("Health Partners"), a state-licensed health maintenance organization ("HMO") owned by Baptist Medical Centers. Axelroth sought compensatory and punitive damages, as well as injunctive relief, based on allegations that Health Partners had violated Ala.Code 1975, § 27-1-19, by refusing to reimburse him for services he had provided to one of his patients, and that Health Partners had intentionally interfered with his practice by falsely telling other patients and potential patients who where also covered by Health Partners that they were not covered for podiatric services. We affirm.
The summary judgment was appropriate if there was no genuine issue of material fact and Health Partners was entitled to a judgment as a matter of law. Rule 56, Ala.R.Civ.P. The burden was on Health Partners to make a prima facie showing that no genuine issue of material fact existed and that it was entitled to a judgment as a matter of law. If it made that showing, then the burden shifted to Axelroth to present evidence creating a genuine issue of material fact, so as to avoid the entry of a judgment against him. In determining whether there was a genuine issue of material fact, we must view the evidence in the light most favorable to Axelroth and resolve all reasonable doubts against Health Partners. Broadus v. Essex Ins. Co., 621 So.2d 258 (Ala.1993).
The following material facts are undisputed: Health Partners was established under Ala.Code 1975, § 27-21A-1 et seq., for the purpose of providing or arranging for health care on a prepaid basis. In 1994 Health Partners obtained contracts to provide health care services to employees of Walker County and the City of Jasper. At that time, Health Partners was in the process of establishing certain credentialing standards for podiatrists and was soliciting from the Alabama Department of Public Health approval of a proposed provider contract for podiatrists; it did not recognize podiatry (involving the diagnosis and treatment of ailments of the human foot) as a covered service under the city and county plans and, therefore, it had no podiatrists participating in those plans. The record indicates that because podiatrists perform in-office surgery it was important to Health Partners to have a procedure for screening podiatrists before accepting them as participating providers. Health Partners' contracts with the city and the county each incorporated a certificate of coverage applicable to the employee members of the plans. Each of the certificates contained a schedule of benefits, which stated in pertinent part:
"In accordance with the provisions of this certificate, members shall be entitled to the services specified hereunder, when such services are (1) medically necessary *882 and (2) performed, prescribed, directed, or authorized in advance by a primary care physician and/or health plan, and provided by participating providers (except those provided as part of a medical emergency).
"....

"Medically necessary physician office visits for the diagnosis and treatment of illness and injury. All services must be either directly provided by member's primary care physician or through primary care physician referral to a participating provider after any required authorizations are obtained from health plan. Such services include but are not limited to medical and surgical procedures...."
Under the "Exclusions" section of the certificates, the following provision appears:
"Except as specifically provided in any supplemental benefit rider ..., included as an attachment to this certificate, the following services and benefits are excluded from coverage:
"1. Services or medical supplies not performed, prescribed, directed, or authorized in advance by a primary care physician.
"2. Services or medical supplies from non-participating providers, including self-referral to participating providers, except in the case of a medical emergency, or when authorized in advance by health plan."
"Routine foot care" was expressly excluded under this section. The following provision appears in the "Limitations" section of the certificates:
"All services must be received from participating physicians, hospitals, pharmacies, and other health care professionals as provided, approved, or authorized by your primary care physician and/or health plan."
Each of the benefits schedules was amended by a "Non-Participating Provider Rider" attached to the certificate of coverage. The rider provided in pertinent part:
"The member's primary care physician may authorize a referral to a non-participating physician. Such non-participating physician must be a specialist.
"....
"This rider does not change, alter, or amend any of the other provisions or limitations of the certificate of coverage."
Dr. Robert C. Osburne, Health Partners' medical director in charge of overseeing medical management, medical policy, and credentialing, testified by deposition with respect to the process under the city and county plans for obtaining coverage for nonparticipating-provider services:
"Q. Would you please explain to me in laymen's language what the [nonparticipating-provider] rider provides?
"A. The ... rider is a rider that we can attach to an HMO contract with a provider that is approved by the state in which on referral we can pay [nonparticipating] providers who have not been through the credentialing process for care that they deliver to our members.
"Q. So that rider gives a patient coverage or provides for payment of services if he or she sees a nonparticipating provider for covered medical services and he or she is referred by a primary care physician; is that correct?
"A. Ifthe criteria that have to be met are, they must [be] covered services, they must be referred by the primary care physician, and there must be a prior authorization number from Health Partners.
"Q. In other words, before they can get coverage, somebody has got to call in and make sure it's covered, correct?
"A. Correct."
As the contractual provisions quoted above indicate, nonroutine foot care was a scheduled benefit under the city and county plans. Vanessa Adams, a former manager of health services with Health Partners, testified by deposition that it was "possible" under the terms of the certificates of coverage applicable to the city and county for nonroutine foot care to be provided to plan members by a duly licensed podiatrist; podiatric services were not excluded under the terms of the certificate of coverage. However, such services were covered only if a plan member obtained a referral from his or her primary care physician and received treatment from a participating podiatrist (of which there were *883 none) or from a nonparticipating podiatrist authorized by Health Partners.
Health Partners informed employees of the city and the county that it would not authorize referrals for podiatric services, and on a number of occasions it refused to authorize the referral of plan members to Axelroth for nonroutine foot care. Health Partners would authorize treatment for nonroutine foot care by an orthopedic surgeon. One of Axelroth's patients, Janice Williams, received treatment by Axelroth after being referred by her primary care physician. The record does not indicate that Williams obtained from Health Partners an authorization for that referral; Health Partners refused to pay Axelroth's bill. Health Partners began accepting applications for podiatrists in July 1995, and Axelroth became a participating provider under the city and county plans in 1996.
Axelroth's statutory and common-law claims are both based on allegations that his services were covered under Health Partners' contracts with the city and the county and that he lost patients before he became a participating provider, as a result of Health Partners' refusal to authorize referrals of plan members to him or to pay him for services he rendered to plan members. Axelroth's statutory claim is based on § 27-1-19 (Ala. Acts 1994, No. 94-638), which provides in pertinent part:
"(a) All persons, firms, corporations, associations, health maintenance organizations, health insurance service, or preferred provider organizations, non-profit health service organizations, and any employer sponsored health benefit company providing health, accident, dental, or workmen's compensation insurance coverage, either directly or indirectly through an agent, shall reimburse health care providers, including physicians, dentists, pharmacists, podiatrists, chiropractors, optometrists, durable medical equipment and home care providers, or subscribers for covered services within 25 working days of receipt of a proper claim or invoice at the office of the insurer or its designated office.
"(b) If a provider of insurance coverage fails to comply with subsection (a), then interest shall be payable on the claim commencing on the 26th day of receipt of the claim at a rate of 1.5 percent per month or any part of a month ... until the claim has been paid, without any further action by the provider being required except as provided in subsection (c).
"(c) This section does not apply to claims where there is a dispute regarding the legitimacy of the claim, and the company or agency does both of the following:
"(1) Notifies the provider within 2 weeks of the receipt of the claim that the claim is in dispute, and specifies which items of the claim are in dispute.
"(2) Pays any undisputed portion of the claim within 30 days of receipt of the claim and makes a timely, good faith effort to resolve differences.
"(d) The insured, or health or dental plan beneficiary may assign reimbursement for health or dental care services directly to the provider of services. Health benefits include medical, pharmacy, podiatric, chiropractic, optometric, durable medical equipment and home care services. The company or agency, when authorized by the insured, or health or dental plan beneficiary, shall pay directly to the health care provider the amount of the claim, under the same criteria and payment schedule that would have been reimbursed directly to the contract provider, and any applicable interest. This amount only applies to assigned claims. Any company or agency making a payment to the insured, or health or dental plan beneficiary, after the rights of reimbursement have been assigned to the provider of services, shall be liable to the provider for the payment. If the company or agency fails to reimburse the provider in accordance with the terms of the provider contract as provided in this section, then the provider shall be entitled to recover in the circuit or district courts of this state from the company or agency responsible for the payment of the claim an amount equal to the value of such claim plus interest and a reasonable attorney's fee to be determined by the court.
"(e) Nothing in this section shall be construed to limit any insurer, health maintenance *884 organization, preferred provider organization, health care service corporation, or other third party payor from determining the scope of its benefits or services or any other terms of its group and/or individual insured, subscriber or enrollee contracts nor from negotiating contracts with licensed providers on reimbursement rates or any other lawful provisions, except that the contract providing coverage to an insured may not exclude the right of assignment of benefits to any provider at the same benefit rate as paid to a contract provider."
Axelroth contends that this section, which is part of the Alabama Insurance Code (Title 27), requires HMOs to reimburse, within a specified time, all health care providers, even nonparticipating providers, for their performance of covered services. He also contends that § 27-1-19 requires HMOs to honor all assignments of benefits, notwithstanding any terms of the health plans to the contrary. Relying on § 27-21A-23 (Ala. Acts 1986, No. 86-471), Health Partners argues that § 27-1-19 is not applicable to HMOs. Section 27-21A-23 provides:
"(a) Except as otherwise provided in this chapter, provisions of the insurance law and provisions of health care service plan laws shall not be applicable to any health maintenance organization granted a certificate of authority under this chapter. This provision shall not apply to an insurer or health care service plan licensed and regulated pursuant to the insurance law or the health care service plan laws of this state except with respect to its health maintenance organization activities authorized and regulated pursuant to this chapter."
There is no provision in Chapter 21A that is comparable to § 27-1-19.
Recently, in Blue Cross & Blue Shield of Alabama, Inc. v. Nielsen, 714 So.2d 293 (Ala. 1998), this Court, responding to a certified question from the United States Court of Appeals for the Eleventh Circuit, held that § 27-1-19 did not apply to Blue Cross, a special purpose nonprofit corporation organized under the provisions of Ala.Code 1975, § 10-4-100 et seq. Our holding in that case was based on the plain language of two Code sections, § 10-4-115 and § 27-1-4, both of which stated that laws appearing in the Alabama Insurance Code did not apply to companies like Blue Cross unless § 10-4-100 et seq. expressly provided that such laws would apply. Noting the similarities between the issue in that case and the one here, Health Partners argues that the same reasoning should apply. Stated differently, Health Partners takes the position that the Legislature, in 1986, made it clear in § 27-21A-23 that any future enactments affecting the operation of HMOs would be made in Chapter 21A of Title 27.
After carefully examining § 27-1-19 and § 27-21A-23, we find merit in Health Partners' argument that our holding in Blue Cross should control this case and that § 27-1-19 should be held inapplicable to HMOs, based on the plain language of the § 27-21A-23 exemption. However, we also find compelling Axelroth's argument that the Legislature could have intended for § 27-1-19 to apply to HMOs, given the fact that it specifically referred therein to "health maintenance organizations" and the fact that the substantive provisions of § 27-1-19 could logically apply to HMOs. In discussing statutory construction, this Court has stated:
"[When a court] is called upon to construe a statute, the fundamental rule is that the court has a duty to ascertain and effectuate legislative intent expressed in the statute, which may be gleaned from the language used, the reason and necessity for the act, and the purpose sought to be obtained."
Ex parte Holladay, 466 So.2d 956, 960 (Ala. 1985). In IMED Corp. v. Systems Engineering Assocs. Corp., 602 So.2d 344, 346 (Ala. 1992), this Court further stated, with regard to statutory construction:
"Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed *885 intent of the legislature must be given effect."
Of course, the problem we face here is similar to the one we faced in Blue Cross, in that we have two sections § 27-1-19 and § 27-21A-23that are clear enough when considered separately, but when considered together send patently conflicting signals as to legislative intent. Obviously the Legislature either intended that § 27-1-19 apply to HMOs or intended that it not apply to them. Under these circumstances, we would normally proceed in accordance with our rules of statutory construction and attempt to ascertain whether the Legislature actually intended for § 27-1-19 to apply to HMOs; however, we find it unnecessary and, thus, imprudent, for us to do that in order to resolve the specific issues between these parties, because, even if we were to assume that § 27-1-19 applies to Health Partners, the record indicates that the summary judgment would be proper.[1]
As previously noted, both of Axelroth's claims are based on allegations that his services were covered under the city and county plans and that he had a statutory right to have Health Partners reimburse him for services he provided to plan members. However, Health Partners made a prima facie showing that the schedules of benefits contained in the applicable certificates of coverage did not include podiatric services unless those services were requested by a plan member's primary care physician and were provided by a participating podiatrist or by a nonparticipating podiatrist authorized by Health Partners. The certificates specifically stated that nonparticipating-provider services had to be authorized by Health Partners. The nonparticipating-provider rider attached to each of the certificates allowed the primary care physician to refer a plan member to a nonparticipating specialist; however, according to the testimony of Dr. Osburne, the rider did not eliminate Health Partners' right under the certificate to disapprove the nonparticipating provider selected by the primary care physician. We can find nothing in the record to dispute Dr. Osburne's testimony in this respect. Furthermore, § 27-1-19(e) provides that "[n]othing in this section shall be construed to limit any... health maintenance organization ... from determining the scope of its benefits or services or any other terms of its group and/or individual insured, subscriber or enrollee contracts."[2] Nothing in § 27-1-19 required Health Partners to allow podiatrists to participate in the city and county plans, and nothing in that section required Health Partners to authorize treatment by nonparticipating podiatrists during the credentialing period. Therefore, in the absence of specific authorization from Health Partners, podiatric services were not "covered" under the city and county plans and Axelroth was not entitled under § 27-1-19 to be paid for services provided to plan members.[3]
*886 Based on the above, we conclude that even if § 27-1-19 applied to Health Partners, Axelroth could not establish a violation of it because he has failed to show that he was denied payment for a covered service. Health Partners was, therefore, entitled to a judgment as a matter of law on Axelroth's statutory claim.
We also conclude that Health Partners was entitled to a judgment as a matter of law on Axelroth's claim alleging intentional interference with his practice. Intentional interference with a contract or business relation is a necessary element of the tort, see Barber v. Business Products Center, Inc., 677 So.2d 223 (Ala.1996); a mere refusal to deal is not actionable. Id. Health Partners made a prima facie showing that podiatric services were not covered under its contracts with the city and the county during the period in question in the absence of a specific authorization from Health Partners and that it was not authorizing podiatric treatment for nonroutine foot care pending the finalization of its credentialing standards and the approval of its proposed provider contract by the Department of Public Health. Axelroth failed to present substantial evidence to rebut Health Partners' prima facie showing that it did not intentionally interfere with his practice by fraudulently representing to his patients that podiatric services were not covered.
For the foregoing reasons, the summary judgment is affirmed.
AFFIRMED.
HOOPER, C.J., and MADDOX, SHORES, KENNEDY,[*] and SEE, JJ., concur.
COOK, J., concurs in the result.
COOK, Justice (concurring in the result).
I concur in the majority's conclusion that Dr. Axelroth did not produce substantial evidence indicating that Health Partners of Alabama ("Health Partners"), which is a health maintenance organization ("HMO"), violated Ala.Code 1975, § 27-1-19, or otherwise wrongfully interfered with the doctor's business relationships. However, the majority alsoand unnecessarilydiscusses at some length whether § 27-1-19 applies to Health Partners. Because that discussion seems to imply that § 27-1-19 does not apply to Health Partners, I do not concur in that portion of the opinion.
Assuming that it does apply, the validity of all of Dr. Axelroth's claims turns on whether Health Partners' selective coverage was wrongful. Significantly, § 27-1-19(e) states: "Nothing in this section shall be construed to limit any ... health maintenance organization... from determining the scope of its benefits or services or any other terms of its group ... contracts...." (Emphasis added.) Thus, that section authorizes Health Partners to exclude coverage of services provided by podiatrists if it so chooses.
Dr. Axelroth focuses on the fact that nonroutine foot care was covered under the plan. However, that focus is misplaced. Health Partners does not dispute the fact that nonroutine foot care was covered; it merely required that such services be performed by orthopedic surgeons, rather than by podiatrists. That sort of selectivity is precisely what § 27-1-19(e) authorizes. Because Health Partners' policy of excluding podiatric services was statutorily authorized, it was not wrongful. The trial court, therefore, correctly entered a summary judgment for Health Partners.
As to whether § 27-1-19 applies to Health Partners, however, I point out that this case differs fundamentally from Blue Cross & Blue Shield of Alabama, Inc. v. Nielsen, 714 So.2d 293 (Ala.1998), in which we concluded that Blue Cross was exempt from the application of § 27-1-19. We did so in that case, not because Blue Cross was an HMO, but because it was a not-for-profit corporation, incorporated pursuant to §§ 10-4-100 to -115. Such entities are expressly exempted by § 27-1-4(2). Nielsen, 714 So.2d at 297.
But HMOs are not so exempted. On the contrary, § 27-1-19(a) expressly includes *887 HMOs. Health Partners states only that it is an HMO, "organized under the laws of the State of Alabama to provide basic health care services through an organized system which combines the delivery and financing of health care to its members. See Ala.Code [1975] § 27-21A-1(7) (1986), et seq." Brief of Appellee, at 3. Significantly, it does not state or allege that it is incorporated pursuant to §§ 10-4-100 to -115. Thus, the rationale of Nielsen does not apply in this case.
Health Partners bases its argument for exclusion on §§ 27-21A-4 and -23. Brief of Appellee, at 11. Section 27-21A-23(a) states in part: "Except as otherwise provided in this chapter, provisions of the insurance law and provisions of health care service plan laws shall not be applicable to any health maintenance organization granted a certificate of authority under this chapter." (Emphasis added.)
That section was adopted in 1986. Section 27-1-19, however, was adapted in 1994, as Act No. 94-638, 1994 Ala. Acts 1197. Thus, § 27-1-19, which expressly includes HMOs, is a later expression of the Legislature on the subject of the applicability of insurance laws to HMOs. As such, it is subject to the well-established rule of statutory construction "`that the last expression of the legislative will is the law, in cases of conflicting provisions in the same statute, or in different statutes, the last enacted in point of time prevails.'" Williams v. State ex rel. Schwarz, 197 Ala. 40, 54, 72 So. 330, 336 (1916) (Thomas, J., dissenting).
The 1986 statute purports to exclude HMOs, while the 1994 statute, the Legislature's later treatment of the subject, purports to include them. Thus, I do not concur in the majority opinion to the extent it suggests that HMOs in general, and Health Partners in particular, are not subject to § 27-1-19.
NOTES
[1] Ideally, any clarification with regard to the scope of § 27-1-19 should be made by the Legislature, not by this Court.
[2] We are not persuaded by Axelroth's argument that § 27-1-15 eliminated Health Partners' contractual right to disapprove treatment by a nonparticipating podiatrist. Section 27-1-15 provides:

"Notwithstanding any other provision of law, when any contract of health insurance or any plan or agreement for health services provides for the reimbursement or payment for services which are within the scope of a podiatrist's professional license as defined in the general laws of Alabama, such policy shall be construed to include payment to a podiatrist who has performed such procedures."
This section was enacted in 1976 (Ala. Acts 1976, No. 678), as part of the Insurance Code. In 1986 the Legislature made it clear in § 27-21A-23 that, "[e]xcept as otherwise provided in [Chapter 21A], provisions of the insurance law and provisions of health care service plan laws shall not be applicable to any health maintenance organization granted a certificate of authority under [Chapter 21A]." There is no provision in Chapter 21A that is comparable to § 27-1-15, which the Legislature is presumed to have been aware of when it enacted the § 27-21A-23 exemption. Blue Cross, supra. Furthermore, as previously noted, the record indicates that podiatric services were covered under the city and county plans, provided Health Partners authorized the treatment. Section 27-1-15 cannot be read so as to void other material provisions in the certificates of coverage, such as the one allowing Health Partners to disapprove treatment by a nonparticipating podiatrist.
[3] The record indicates that Health Partners did on occasion authorize treatment by a podiatrist. These authorizations appear to have been exceptions that were made based on the peculiar circumstances of those cases.
[*] Although Justice Kennedy was not present at oral argument in this case, he listened to the tape of oral argument.